United States Court of Appeals
Fifth Circuit

**F I L E D**

May 30, 2007

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 06-60446

_____

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

Plaintiff-Appellee

v.

FIREMAN'S FUND INSURANCE COMPANY,

Intervenor Defendant-Appellant

-----------------------
Appeal from the United States District Court
for the Southern District of Mississippi
(3:01-CV-860)
-----------------------

Before HIGGINBOTHAM, WIENER, and CLEMENT, Circuit Judges.

WIENER, Circuit Judge[*]:

During the pendency of an underlying state court lawsuit, Defendant-Appellant Fireman's Fund Insurance Company ("Fireman's Fund"), an excess insurer, settled the lawsuit on behalf of its insured. Thereafter, Fireman's Fund sought to recover partial reimbursement from Plaintiff-Appellant Liberty Mutual Fire Insurance Company ("Liberty Mutual"), a primary insurer, in a separate federal declaratory judgment action. The district court dismissed Fireman's Fund's reimbursement claim, concluding that

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

it was barred by Mississippi's voluntary payment doctrine. Perceiving no reversible error, we affirm.

## I. FACTS AND PROCEEDINGS

In a 2001 Mississippi state court lawsuit ("the Doe lawsuit"), Tina Doe alleged that, while she was a tenant in the Signature Square Apartment Complex ("the Complex"), she was assaulted and raped by an employee of the Complex. Just days before the alleged incident, Virtu Signature Square Associates, L.L.C. ("Virtu") had purchased the Complex.

In her complaint, Doe asserted claims against two categories of defendants: (1) Virtu, as owner of the Complex at the time of the incident, and Linda Denham, as Virtu's office manager at the time of the incident, and (2) the immediately preceding owner of the Complex, its allegedly related entities, and one of its employees —— Jorad-Jackson I Limited Partnership d/b/a Signature Square Apartments, Del Development Corporation, SGI Nevada, Inc. and Pete Brown (collectively, "the Del Defendants").

At the time of the incident, Virtu was a named insured under a primary commercial general liability policy issued by Liberty Mutual Insurance to Property Owners Purchasing Group ("the Liberty Mutual Policy"). The policy limit of the Liberty Mutual Policy was $1 million.

Pursuant to the terms of that policy, Liberty Mutual agreed

2

to defend Virtu and Denham against the claims asserted in the Doe lawsuit, subject to a reservation of rights, and thus retained and paid for defense counsel. Liberty Mutual also filed the present action in the district court, seeking a judicial declaration that the Liberty Mutual Policy did not provide coverage for the claims asserted against Virtu and Denham in the Doe lawsuit.

In December 2002, Doe amended her state court lawsuit, adding additional defendants. These additional defendants included Greystar Management Services, L.P. ("Greystar"), which was the management company for the Complex at the time of the incident, and two other allegedly related entities.

Greystar was an additional insured under the Liberty Mutual Policy. As such, Liberty Mutual agreed to defend Greystar against the claims in the Doe lawsuit and thus retained and paid for defense counsel. Liberty Mutual did not deny coverage or seek a judicial determination that the Liberty Mutual Policy did not provide coverage to Greystar for the claims asserted in the Doe lawsuit, and thus did not proceed under a reservation of rights.

Liberty Mutual assigned two claims professionals to work the Doe lawsuit. Jamie Moray handled and monitored the <u>defense</u> of Virtu, Denham, and Greystar in the Doe lawsuit; Antonio Glenn

3

handled all issues of <u>coverage</u> under the Liberty Mutual Policy.

At the time of the incident, Greystar was also insured under an excess/umbrella policy issued by Fireman's Fund ("the Fireman's Fund Policy"). The policy limit of the Fireman's Fund Policy was $25 million.

In July 2003, after the conclusion of an unsuccessful mediation, Fireman's Fund was notified of the Doe lawsuit, which was set to be tried approximately three to four weeks later. On receiving notice, Fireman's Fund assigned James Shaw to handle the claims asserted against Greystar in the Doe lawsuit.

Shaw believed that Greystar's potential exposure in the Doe lawsuit exceeded the $1 million policy limit of the Liberty Mutual Policy. Moray believed that the facts and circumstances did not demonstrate a significant potential liability on the part of Virtu, Denham, or Greystar.

After numerous communications between Moray and Shaw, Moray advised Shaw that $200,000.00 was the maximum amount that Liberty Mutual would pay to settle the claims against Greystar. Moray also advised Shaw that he was not the adjuster responsible for or involved in the handling of any coverage issues under the Liberty Mutual Policy and that these issues were being handled by Glenn. During one telephone conversation, Shaw advised Moray that Fireman's Fund might, after settling the Doe lawsuit, file suit

4

against Liberty Mutual.

Following these discussions, Shaw sent Moray an email which stated, in part:

> [Fireman's Fund] is not convinced that [the Liberty Mutual Policy] does not apply. As such, we are forced to negotiate settlement in [the Doe lawsuit] with minimal contribution from [Liberty Mutual]. Please be advised that we are doing so under a full reservation of rights under the policies, and that we specifically reserve the right to resolve the coverage issues after the fact.

After sending this email, Shaw, together with his Fireman's Fund counterparts handling the Doe lawsuit under the policy issued to the Del Defendants, assumed complete control of the settlement negotiations in the Doe lawsuit. Shaw and his counterparts agreed to pay Doe $3 million to settle all claims she asserted in the Doe lawsuit and agreed among themselves to allocate this settlement equally between the Del Defendants and Greystar — actually between their respective insurers — each paying $1.5 million.

Of Greystar's allocated $1.5 million, Liberty Mutual paid $200,000.00, which was consistent with its prior representations to Fireman's Fund. Fireman's Fund paid $1.3 million, the balance of the settlement.

In February 2005, Fireman's Fund, which had previously intervened in Liberty Mutual's federal declaratory judgment

5

action, filed a motion for summary judgment, contending that the Liberty Mutual Policy provided coverage to Greystar and, as such, Fireman's Fund was entitled to recover $800,000.00 (the $1 million Liberty Mutual Policy limit minus the $200,000.00 already paid by Liberty Mutual) of the $1.3 million that Fireman's Fund had paid in settling the claims against Greystar. On the same day, Liberty Mutual filed its own cross-motion for summary judgment, contending that Mississippi's voluntary payment doctrine precluded any recovery from Liberty Mutual by Fireman's Fund.

In February 2006, the district court granted, without reasons, Liberty Mutual's summary judgment motion and entered final judgment in Liberty Mutual's favor. Fireman's Fund timely filed a notice of appeal.

## II. ANALYSIS

A. Standard of Review

We review grants of summary judgment de novo, applying the same standard as the district court.[1] Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[2]

---

[1] Abarca v. Metro. Transit Auth., 404 F.3d 938, 940 (5th Cir. 2005).

[2] Dallas Fire Fighters Ass'n v. City of Dallas, 150 F.3d 438, 440 (5th Cir. 1998).

6

The parties agree that Mississippi law applies in this diversity action.[3]

B.    Applicable Law

The voluntary payment doctrine is a common law construct that has been consistently followed in Mississippi.[4]  Under this maxim,

> "[A] voluntary payment can not be recovered back, and a voluntary payment within the meaning of this rule is a payment made without compulsion, fraud, mistake of fact, or agreement to repay a demand which the payor does not owe, and which is not enforceable against him, instead of invoking the remedy or defense which the law affords against such demand."[5]

In contrast, an "involuntary payment" is one "'not proceeding from choice.'"[6]  Thus, payments made by virtue of a legal obligation, by accident, by mistake, or under compulsion are not considered voluntary and thus are not barred from recovery under the voluntary payment doctrine.[7]  In addition, a mutual agreement between insurance companies to litigate their respective liabilities between themselves after settling an underlying

---

[3] Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).

[4] Genesis Ins. Co. v. Wausau Ins. Co., 343 F.3d 733, 736 (5th Cir. 2003).

[5] Id. (quoting McDaniel Bros. Constr. Co. v. Burk-Hallman Co., 175 So. 2d 603, 605 (Miss. 1965)).

[6] Id. at 738.

[7] Id.

7

lawsuit will preclude application of the voluntary payment doctrine.[8]

## C. Merits

### 1. Voluntary Payment

The first issue on appeal is Fireman's Fund contention that its settlement payment was not voluntary, because it had a legal obligation to settle the Doe lawsuit on behalf of Greystar. In support of its position, Fireman's Fund relies on State Farm Mutual Automobile Insurance Co. v. Allstate Insurance Co.[9] Fireman's Fund's reliance on State Farm is misplaced, however.

State Farm stands for the legal proposition that a primary insurer is under a legal obligation to defend and settle a lawsuit in the best interests of its insured; and thus, if a co-primary insurer fails to participate in a successful settlement negotiation, the voluntary payment doctrine does not preclude an action for contribution. Under the Fireman's Fund Policy, though, Fireman's Fund is not a primary insurer charged with the duty to defend. Rather, Fireman's Fund is an excess/umbrella insurer under no obligation to defend or settle any lawsuit against Greystar. Fireman's Fund's sole obligation was to pay any amount, up to the limit of its policy, that exceeded the

---

[8] Id. at 736.

[9] 255 So. 2d 667, 669 (Miss. 1971).

8

limits of any primary insurance policy. Thus, Fireman's Fund has inappropriately attempted to agglomerate to itself as an excess/umbrella insurer the primary insurer's duty to defend and thereby avoid the consequences of the voluntary payment doctrine.

In addition, Fireman's Fund relies on <u>Canal Insurance Co. v. First General Insurance Co.</u>[10] as imposing on it another legal obligation to settle the claims against Greystar. This reliance is also misplaced.

In <u>First General</u>, Canal, an insurer, had no duty to defend the claims against its insured in an underlying lawsuit, but nonetheless provided a defense, under a reservation of rights, after First General, another insurer, wrongfully refused to provide one.[11] After providing the defense, Canal sought to recover its defense costs from First General, which argued in opposition that Canal's defense payments were voluntary and thus unrecoverable.[12]

In reversing the district court's ruling in favor of Canal, we determined that Canal was not a volunteer.[13] After acknowledging that Canal had no policy obligation to provide a

_____

[10] 889 F.2d 604 (5th Cir. 1989).

[11] <u>Id.</u> at 611-12.

[12] <u>Id.</u>

[13] <u>Id.</u>

9

defense to its insured, which seemingly would have rendered Canal a volunteer, we nevertheless held that, because of a mandatory state-law insurance endorsement that effectively made Canal its insured's surety as to any judgments rendered against the insured, Canal (1) reasonably could have feared that a court might construe this endorsement as requiring Canal to provide its insured a defense, and (2) had a manifest interest in controlling the underlying litigation to minimize the size of any judgments after First General had denied coverage and refused to provide a defense.[14] Based solely on these two circumstances, both of which arose from an endorsement mandated by state-law, we concluded that Canal could not be characterized as a volunteer.[15]

Here, there exists nothing akin to the mandatory state-law endorsement in First General that (1) might have reasonably caused Fireman's Fund to fear that a court could conclude that it had a duty to defend, or (2) imbued Fireman's Fund with a manifest interest in controlling the litigation. Furthermore, even if there had been a similar endorsement, Liberty Mutual never denied coverage as to Greystar and had agreed from the outset to provide Greystar with a defense, thereby nullifying any interest that Fireman's Fund might have had in controlling the

---

[14] Id.

[15] Id.

10

litigation.  We are satisfied that Fireman's Fund had no legal obligation to make a settlement payment on Greystar's behalf and thus cannot avoid the application of the voluntary payment doctrine by means of an "involuntary" payment defense.

2.    Mutual Agreement to Litigate Post-Payment

The second issue on appeal is Fireman's Fund's contention that summary judgment was improperly granted, as — it asserts — there exists a genuine fact issue whether a mutual, pre-settlement agreement to litigate coverage issues post-settlement existed between it and Liberty Mutual.  According to Fireman's Fund, sufficient evidence of such a mutual agreement exists to create a genuine issue of material fact and thus make the district court's grant of summary judgment erroneous. Specifically, Fireman's Fund points to (1) Shaw's deposition testimony, (2) the August 2001 email from Shaw to Moray, (3) Moray's file notes, and (4) a September 2001 letter from Liberty Mutual to Wausau, as support for its contention that a factual conflict exists whether the parties agreed to litigate the coverage issue subsequently.

a.    Deposition Testimony

Initially, Fireman's Fund contends that Shaw's deposition testimony evidences that the two insurers did mutually agree to litigate their respective liabilities subsequently.   In his

11

August 17, 2004 deposition, Shaw testified, in part:

Q:   Anything else you can recall about your conversations with Mr. Moray?

A:   Yes.

Q:   What else?

A:   When we came to settling the case, Liberty Mutual's contribution was $200,000. I did not believe that that represented Liberty's exposure, and I told him directly that we were going to sue them for it and that I was going to send him a reservation of rights letter, and he said, "You do what you have to do."

And I told him that I felt Liberty was trying to manipulate this from a position of noncoverage and I was offended that they could take that position and I was further offended, after we had had those discussions, that there could now be raised the element that we might have made a volunteer payment there, which was at no time discussed because the disagreements on coverage were pretty stark.

Q:   But you and Mr. Moray discussed a voluntary payment issue?

A:   No, that was never brought up.

Q:   Never came up?

A:   Well, I took his contribution to the settlement as a ratification, that it was reasonable and that what was being agreed to ⸺ the settlement was acceptable and not outside the bounds of what should be paid in settlement for such a loss.

Q:   At no time did you ⸺ did Mr. Moray ever raise with you voluntary payment?

A:   Not at all.

12

Q: Never used that term with you?

A: Not at all.

. . .

Q: So when you left off with Mr. Moray, it was, "We're going to get this case settled and then we're going to sue you"?

A: "We will do what we have to to seek recovery."

Q: Well, did you tell him that you were going to sue him or did you tell him that you were going to do what you had to do to seek recovery?

A: I mentioned the word "sue." I mentioned "recovery." I probably told him ten times what we were going to do.

Q: Was there ever a verbal agreement between you and Mr. Moray to the effect that Liberty Mutual would contribute $200,000; Fireman's Fund would contribute the balance; and that both parties would agree to resolve any coverage issues in a subsequent proceeding?

A: Do you mean did I have his permission ──

Q: Yes.

A: ── to settle the claim or to sue Liberty Mutual?

Q: To sue Liberty Mutual.

A: I had his acknowledgment that we would do that if we had to. He acknowledged that that would be appropriate.

Q: He understood that that's what you were going to do?

A: That was ── yeah, one of the potential ── either arbitration or litigation or even negotiation later outside the realm of an arbitration, but

13

that this would be brought to resolution at some point.

Q:   I mean, you made that clear to him that you were going to do that?

A:   Yes.   And there was never any disagreement from him on that part.

Q:   Did he expressly agree that that would be fine?

A:   Yes.

. . .

Q:   And is that the reservation of rights letter —— the reservation of rights you're referring to?

A:   That is, yes.

Q:   And there's nothing in this e-mail about Liberty Mutual agreeing to resolve the coverage issues after the fact?

A:   The discussion had been that we will, and I didn't see the need to point out that, "You have agreed that we" —— I didn't believe there was any need to gain Liberty Mutual's agreement for us to sue them later since they had disclaimed coverage and we felt that they were not stepping up to the plate fully in a defense obligation; that for us to have the onus or the burden of obtaining their agreement would be ludicrous.   That ——

Q:   That just wasn't necessary in your mind?

A:   —— wasn't necessary, no.

Q:   In your mind, you were doing everything you could to preserve Fireman's Fund's right to litigate later or arbitrate later against Liberty Mutual?

A:   We were reserving our rights.   We had told them that we would do so.

14

Q:   And you're telling them again?

A:   And I'm telling them again, and now we're sitting
     here talking about it.

As can be seen from this deposition testimony, Shaw was attempting to get Liberty Mutual to raise its settlement contribution and, in this effort, he threatened the possibility of a lawsuit. Moray responded, in essence, that, regardless of a potential lawsuit, Liberty Mutual was not going to raise its contribution and Fireman's Fund could go do whatever it wanted. Although there was some mutual assent, it was not directed towards a subsequent coverage lawsuit between the two insurers. Instead, both parties acknowledged that Liberty Mutual would not raise its settlement contribution over $200,000.00 and Fireman's Fund could do whatever it wanted in response. This is not sufficient to constitute mutual assent to subsequent coverage litigation.

    b.   Email

In the August 2001 email from Shaw to Moray, Shaw wrote, in part:

    We are not convinced that Liberty International
    Underwriters' Policy RG2-W31-004265-010 does not apply.
    As such, we are forced to negotiate settlement in this
    matter with minimal contribution from Liberty
    International Underwriters. Please be advised that we
    are doing so under a full reservation of rights under
    the policies, and that we specifically reserve the
    right to resolve the coverage issues after the fact.

15

Fireman's Fund contends that this email constitutes a pre-settlement, mutual agreement to reserve the right to litigate the parties' coverage issues subsequently. We disagree.

In his email, Shaw purports <u>unilaterally</u> to reserve Fireman's Fund's right to litigate. This is not sufficient to preclude application of the voluntary payment doctrine, which requires that all interested parties <u>mutually</u> agree to litigate subsequently.

        c.   <u>File Notes</u>

In his file notes relating to the Doe lawsuit, Moray observed, in part: "Jim Morey —— 6/3/04 —— A review of the file reveals that on 8/11/03, the case settled for $3,000,000.00 with Liberty's contribution being $200,000. Thereafter, the matter is subject to coverage litigation. This part of the file is being handled by Tony Glenn." Fireman's Fund asserts that this notation also supports its position that the parties did reserve their rights to litigate subsequently.

Fireman's Fund's position is unpersuasive. This file note does not reference Shaw, Fireman's Fund, or any agreement between Liberty Mutual and Fireman's Fund with respect to the Doe lawsuit. In addition, this note was written approximately ten months <u>after</u> the Doe lawsuit was settled and several months <u>after</u> Fireman's Fund filed its intervention complaint with the district

16

court. These notes are simply file documentation from a periodic file review, not evidence of a ten-month-old mutual agreement to litigate.

d. Letter

The last item of evidence offered by Fireman's Fund is a September 2001 letter from Liberty Mutual to Fireman's Fund. The letter states, in part:

> I have enclosed in connection with the reference matter Liberty Mutual Fire Insurance Company Check No. 8018688 in the amount of $200,000 made payable to [Ms. Doe and her attorneys].
>
> Tender of this check by Liberty Mutual Fire Insurance Company is not intended as nor should it be construed as an admission by Liberty Mutual Fire Insurance Company or any related companies of any liability under Policy No. RG2-W31-004265-010 in connection with the matters at issue. Said tender is made subject to Liberty Mutual Fire Insurance Company's full and complete reservation of rights under the above-reference policy and without prejudice to any of the claims and/or defenses currently asserted or which may be asserted by Liberty Mutual Fire Insurance Company in the lawsuit styled and numbered Liberty Mutual Fire Insurance Company v. Virtu Signature Square Associates, LLC, et al., in the United States District Court for the Southern District of Mississippi, Jackson Division, Civil Action No. 3:01CV860WS.

Like the other items, this letter too fails to prove a mutual agreement between Fireman's Fund and Liberty Mutual. It does not mention Fireman's Fund or any mutual agreement between Fireman's Fund and Liberty Mutual. Neither does it purport to reserve any of Liberty Mutual's rights with respect to Fireman's

17

Fund.  Instead, it <u>unilaterally</u> confirms Liberty Mutual's reservation of rights under the Liberty Mutual Policy with respect to its insureds and reserves all existing claims and defenses with respect to the pending lawsuit between Liberty Mutual and Virtu and Denham.  It is therefore insufficient to constitute evidence of a mutual agreement to litigate subsequently.

### III.  CONCLUSION

Based on the applicable law and our extensive review of the parties' briefs and the record on appeal, we hold that the district court did not err in ruling that Fireman's Fund's claims were barred by the application of Mississippi's voluntary payment doctrine.

AFFIRMED.